**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
REGINALD BOUNDS,        :
                            :
        Plaintiff,       :              Hon. Dennis M. Cavanaugh
                            :
        v.                :             **OPINION**
                            :
COMMISSIONER OF SOCIAL   :        Civil Action No.: 05-0142 (DMC)
SECURITY,              :
                            :
        Defendant.    :
_____:

DENNIS M. CAVANAUGH, U.S.D.J.

      This matter comes before the Court upon Reginald A. Bounds's ("Plaintiff") appeal from a final decision of the Commissioner of Social Security's ("Commissioner") denying his request for disability insurance benefits and Supplemental Security Income ("SSI") under the Social Security Act ("the Act").  The Court has jurisdiction to review this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons set forth below, the final decision of the Commissioner is **affirmed**.

## I. **Background**

     Plaintiff, born on November 22, 1959, has a high school education.  His work history includes experience as a maintenance worker, truck driver, laborer, dishwasher, and hog shackler.  In his applications for disability insurance benefits and SSI, he alleges he has been disabled and unable to work since January 10, 2001.

### **A. Procedural History**

     Plaintiff protectively filed an application for disability insurance benefits on April 11, 2001, alleging disability since January 11, 2001.  His claims were initially denied.  Plaintiff filed

a second application for disability insurance benefits on February 28, 2002, and an application for SSI on August 29, 2002.  The applications were denied initially and on reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  After a hearing, the ALJ, in a decision dated February 24, 2004, found Plaintiff was not disabled within the meaning of the Act.  On November 12, 2004, the Appeals Council denied Plaintiff's request for review, upon which the ALJ's decision became the final decision of the Commissioner.  Plaintiff appealed the Appeals Council decision and filed this action in District Court on January 7, 2005.

## B. Factual History

### 1. Medical Records Relating to Plaintiff's Physical Injury

In January 2001, Plaintiff injured his back while shoveling snow at work.  (R. at 30). Plaintiff underwent a magnetic resonance imaging ("MRI") procedure in March 2001, which showed disc herniation with ventral impingement on the thecal sac.  (R. at 135).  Upon the recommendation of his doctor, Plaintiff underwent surgery to remove a disc in June.  (R. at 184).

Following surgery, Plaintiff received physical therapy treatment at Healthsouth Rehabilitation. (R. at 371).  A functional capacity examination on October 2, 2001, indicated Plaintiff could work in the sedentary exertional level. (R. at 372.)  The examination also showed Plaintiff's peak heart rate was fifty-eight percent of predicted heart rate despite complaints of severe pain, suggesting self-limitation by Plaintiff.   (Id.)  On October 8, 2001, the physical therapist's opinion was that Plaintiff had made only trace improvements.  (R. at 368).  On October 11, 2001, Plaintiff complained that he was "hurting all over" and required modification of activities in order to tolerate a full treatment session.  (R. at 363-64).  On October 25, 2001, Plaintiff underwent another functional capacity examination at Novacare.  (R. at 341-46).  The

physical therapist there noted that Plaintiff complied with all tasks even though he needed to take frequent breaks, he was unable to complete the minimum for the Dictionary of Occupational Titles frequency for bending or standing, and was severely limited in lifting and carrying secondary to pain and unsafe techniques.  (R. at 344).  The evaluation also mentioned that Plaintiff received consistently high scores for inappropriate illness behavior on all but one test.  (R. at 343).

By the end of October, Plaintiff's orthopedic surgeon, Dr. Joseph Lombardi, reported Plaintiff had only restricted lumbrosacral range of motion findings, and no sensory or reflex loss or muscle weakness.  (R. at 174).  In November, Dr. Lombardi's replacement, Dr. Hervey Sicherman, reported Plaintiff could return to work, provided that he did not lift more than twenty-five or thirty pounds and that he sit for a few minutes several times a day.  (R. at 341).

In November 2001, Dr. F.J. Miranda, a non-examining state agency physician, stated Plaintiff could frequently lift up to ten pounds, stand at least two hours, and sit about six hours in a working day.  (R. at 206).  Dr. Miranda also stated Plaintiff would have to periodically alternate between sitting and standing due to his chronic back pain.  (Id.)  In June 2002, another assessment by a state agency physician reported the same conclusions.  (R. at 394).

Also during June, Dr. John Sawicki examined Plaintiff at the request of the Commissioner.  (R. at 387-92).  Dr. Sawicki reported Plaintiff complained of low back pain into his left leg and that he used a cane even though he was able to walk without one.  (R. at 387-88).  After the examination, Dr. Sawicki found Plaintiff had restricted range of motion, but no reduction in muscle strength, and no sensory or reflex loss.  (R. at 388).  Dr. Sawicki also noted Plaintiff dressed, undressed, and made transfers slowly, and could walk on his heels and toes.

(R. at 388-89).

In September 2002, Plaintiff's treating neurologist, Dr. Ralf van der Sluis, reported that a repeat lumbar spine MRI dated August 2002 showed mild scarring, but no new disc herniation. (R. at 457).   He also stated Plaintiff was a "well-looking veteran in no acute distress."  (R. at 455).  In November 2002, Dr. van der Sluis observed that Plaintiff had normal strength and some right-side sensory loss. ( Id.)  The medical records indicated that Plaintiff complained about his pain and spent much time lying in bed watching television.  (Id.)  On November 21, 2002, Dr. van der Sluis completed a report for the State of New Jersey, where he noted Plaintiff's functional capacity was adequate to perform few or none of the duties of his usual occupation or self-care.  (R. at 430).  Dr. van der Sluis also stated Plaintiff was unable to work.  (R. at 429).

The May 2003 records from the Veterans Administration indicate Plaintiff had normal muscle bulk and tone, with no loss in strength.  (R. at 451).  The July 2003 records show Plaintiff's lumbar spine range of motion was limited by fifty percent.  (R. at 648).

On a questionnaire completed in July 2003, Dr. van der Sluis stated Plaintiff had limited range of motion, tenderness, antalgic gait, sensory loss, and muscle weakness.  (R. at 554-55). According to the questionnaire, Plaintiff experienced daily pain, precipitated by walking, standing, and sitting.  (R. at 556).  Dr. van der Sluis stated that Plaintiff's tolerance for standing, walking, and sitting was limited to no more than one hour per eight-hour work day and that he was incapable of tolerating even low work stress.  (Id.)  Dr. van der Sluis also stated Plaintiff's pain constantly interfered with his ability to concentrate, that he would need to take breaks every two hours if working, and that his impairment would cause him to be absent from work more than three times a month.  (R. at 558-59).  However, Dr. van der Sluis noted that Plaintiff's

prognosis was good and that he could perform a full-time competitive job that required keeping the neck in a constant position (R. at 554, 559).

In November 2003, Dr. Torbjoern Nygaard and Dr. Syed Moosvi reported Plaintiff had full motor strength, no sensory loss, and normal gait.  (R. at 650).  In September 2004, Dr. Nygaard noted Plaintiff continued to experience back and leg pain and that prolonged standing and sitting would increase discomfort.  (R. at 676).  Dr. Nygaard believed that significant recovery for Plaintiff was unlikely without further surgery and that Plaintiff was incapable of performing meaningful, full-time, "competitive" work at that time.  (Id.)

### 2. Medical Records Relating to Plaintiff's Mental Condition

Plaintiff began seeking psychiatric treatment in July 2002, when he visited Dr. William Mysels, who diagnosed Plaintiff with a mood disorder due to chronic pain and a history of substance abuse.  (R. at 471).  Initially, Dr. Mysels reported Plaintiff was cooperative, pleasant, alert, and oriented and that his speech was spontaneous, coherent, and relevant. (Id.)  He also stated Plaintiff did not express bizarre or paranoid ideas and that there was no evidence of cognitive deficits.  (Id.)  Dr. Mysels noted Plaintiff's mood was situationally depressed due to chronic pain, but that he was nonetheless able to smile appropriately and showed no psychomotor slowing or suicidal ideation.  (Id.)  In Dr. Mysels's opinion, Plaintiff's insight and judgment were good.  (Id.)

In August 2002, Dr. Mysels reported Plaintiff did not demonstrate signs of clinical depression but did complain of insomnia.  (R. at 461).  Medical records also show Plaintiff felt tired due to medication and was frustrated at not being able to do anything during the day.  (R. at 462).

In September 2002, a non-examining state agency psychiatrist reviewed Plaintiff's medical records and found that Plaintiff showed no signs of clinical depression, although his sleep was disturbed by chronic pain.  (R. at 411-26).  The psychiatrist also determined Plaintiff did not evidence any thought disorders and that his psychological symptoms appeared to be secondary to his physical allegations.  (Id.)

In December 2002, Plaintiff returned to Dr. Mysels, who noted that medication helped Plaintiff with his sleep.  (R. at 453.)  In April 2003, Dr. Mysels again diagnosed Plaintiff with mood disorder due to chronic pain.  (R. at 615.)  In June 2003, Plaintiff reported that when he took small doses of Paxil, he was less irritable, his mood was brighter, his thinking was clearer, and he was more interested in engaging in activities.  (R. at 623.)  In December 2003, Dr. Mysels reported that Plaintiff claimed no change in mental status.  (R. at 652.)

### 3. Plaintiff's Testimony

At hearing, Plaintiff testified about his physical and mental condition and his opinion of some of his treating physicians.  According to Plaintiff, he had lost weight since his injury because he was depressed and lost his appetite due to his medication.  (R. at 29).  He had been using a cane since his surgery and used a TENS[1] unit when the pain was severe.  (R. at 31-32).  He lived on a second-floor walk-up apartment and made it up by grabbing the handrails.  (R. at 30-31).  He felt like his back was getting worse since surgery and testified that the pain was in his lower back but radiated all the way down his left leg.  (R. at 32-33).  He stated the pain was constant and was made worse by moving around.  (R. at 33).  He could not lie on his left side,

---

[1]Transcutaneous electrical nerve stimulation.  F.A. Davis, Taber's Cyclopedic Medical Dictionary, (2002).

but laying on his right side provided relief.  (R. at 35).  Plaintiff remained in that position for fourteen to sixteen hours on a typical day. (Id.)  He could stand for about fifteen minutes before the pain caused him to alternate between sitting and standing.  (R. at 36-37).

Plaintiff testified that he first sought psychiatric treatment because he was feeling down and was irritable around people.  (R. at 39).  Prior to his January 2001 injury, he was a social person, whose hobbies included fishing, hunting, dancing, and going to the park. (R. at 39-40).  As of the time of the hearing, Plaintiff still went to the park but could not stay there for a long period of time.  (R. at 40).

At home, he shaved twice a week because leaning over the sink bothered his back.  (Id.)  He had not had a haircut in six months.  (Id.)  He had a difficult time getting dressed and cooked only when using a microwave.  (R. at 41-42).  His friend cooked, cleaned, shopped, and did the laundry for him.  (R. at 42).  Plaintiff stated that, if necessary, he got around to places by driving himself.  (R. at 48).

Regarding his medical treatment, Plaintiff testified that Dr. Lombardi and Dr. Sicherman were chosen by his employer's workers' compensation insurance carrier.  (R. at 42.)  According to Plaintiff, Dr. Lombardi at first wanted Plaintiff to forego surgery and return to work.  (R. at 42-43.)  When told that both doctors believed that he was exaggerating his complaints, Plaintiff stated that both doctors hardly examined him and that neither wanted to touch him.  (R. at 44.)  He eventually filed a complaint against Dr. Lombardi.  (R. at 43.)  In comparison, Plaintiff stated that Dr. van der Sluis did not think he was exaggerating his complaints.  (R. at 45.)

### 4. The Decision of the ALJ

After recounting and analyzing the facts above, the ALJ determined Plaintiff was not

disabled within the meaning of the Act and therefore denied his application for disability benefits. (R. at 17-24). Specifically, the ALJ found Plaintiff suffered from a severe impairment relating to his back surgery, but that any mental impairment did not have more than a slight effect on his ability to perform basic work activities. (R. at 22). Although Plaintiff's severe impairment prevented him from engaging in any of his past relevant work, the ALJ found he still retained the residual functional capacity to perform a full range of sedentary work and was thus not disabled. (R. at 23). In reaching this decision, the ALJ decided not to accord significant weight to Plaintiff's subjective complaints and to Plaintiff's treating neurologist. (R. at 19-20). Rather, the ALJ relied on the remaining objective medical evidence of record in denying Plaintiff's disability application. (R. at 19-22).

## II. Discussion

### A. Standard of Review

A claimant is entitled to benefits under the Act only if he satisfies all the relevant requirements of the statute. To establish a valid claim for disability insurance benefits and SSI benefits, the claimant must meet the insured status requirements of 42 U.S.C. § 423(c) and the income and resource limitations of 42 U.S.C. §§ 1382(a) and 1382(b), respectively. Furthermore, for purposes of both types of benefit, the claimant must demonstrate that he was disabled within the meaning of the Act.

### B. Disability Analysis

Under the Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

8

of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A); see, 42 U.S.C. § 1382c(a)(3)(A).

Physical or mental impairments are those that "result[] from anatomical, physiological or

psychological abnormalities which are demonstrable by medically acceptable clinical and

laboratory diagnostic techniques."  42 U.S.C. § 423 (d)(3); 42 U.S.C. § 1382c(a)(3)(D).

Furthermore, an individual "shall be determined to be under a disability only if his physical or

mental impairment or impairments are of such severity that he is not only unable to do his

previous work but cannot, considering his age, education and work experience, engage in any

other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. §

423(d)(2)(A).

Social Security regulations provide a five-step, sequential evaluation procedure to

determine whether a claimant is disabled.  20 C.F.R. § 404.1520.   First, the Commissioner must

inquire whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. §

404.1520(a)(4)(i).  If the claimant is found to be currently engaged in substantial gainful activity,

he will be found not disabled without consideration of his medical condition.  20 C.F.R. §

404.1520(b).  Second, if the claimant is not engaged in substantial gainful activity, the

Commissioner must then decide whether the claimant suffers a severe impairment.  20 C.F.R. §

404.1520(a)(4)(ii).  If the impairment is not severe, the claimant will be found not disabled.  20

C.F.R. § 404.1520(c).  Third, if the claimant is found to be suffering from a severe impairment,

the Commissioner must decide whether the impairment equals or exceeds in severity one of the

impairments listed in Appendix I of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the

impairment is listed or is the equivalent to a listed impairment, the Commissioner must find the

claimant disabled without consideration of other facts.  20 C.F.R. § 404.1520(d).  Fourth, if the

9

impairment is not listed, the Commissioner must consider whether the claimant has sufficient residual functional capacity to perform his past work.  20 C.F.R. § 404.1520(a)(4)(iv).  Residual functional capacity is defined as what the claimant "can still do despite [his] limitations."  20 C.F.R. § 404.1545(a)(1).  If a claimant has the residual functional capacity to meet the physical and mental demands of his past work, the Commissioner must find him not disabled.  20 C.F.R. § 404.1520(f).  Finally, if the claimant cannot perform any past relevant work, the Commissioner must determine, on the basis of claimant's age, education, work experience, and residual functional capacity, whether he can perform any other work.  20 C.F.R. § 404.1520(a)(4)(v).  If he cannot, the Commissioner will find him disabled.  20 C.F.R. § 404.1520(g).  The claimant bears the initial burden of proving that his impairment prevents him from returning to past relevant work.  Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 118 (3d Cir. 2000).  If the claimant satisfies the first four steps, then the burden shifts to the Commissioner to prove the existence of work that exists in significant numbers in the national economy and that the claimant could perform.  Id.

## C. Scope of Review

A reviewing court must uphold the Commissioner's factual findings if they are supported by substantial evidence.  42 U.S.C. §§ 405(g), 1383(c)(3); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000).  Substantial evidence means "more than a mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971); (quoting, Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Perales, 402 U.S. at 401; (quoting, Consol. Edison, 305 U.S. at 229).  However, substantial evidence "does not mean a large or considerable amount of evidence . . . ."  Pierce v.

10

Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence may be "less than a

preponderance."  Stunkard v. Sec'y of Health & Human Servs., 841 F.2d 57, 59 (3d Cir. 1988).

Some types of evidence will not be "substantial."  For example,

> [a] single piece of evidence will not satisfy the substantiality test if the
> [Commissioner] ignores, or fails to resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it is overwhelmed by other evidence –
> particularly certain types of evidence (e.g., that offered by treating physicians) –
> or if it really constitutes not evidence but mere conclusion.

Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983); (quoting, Kent

v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)).

"The substantial evidence standard allows a court to review a decision of an ALJ, yet

avoid interference with the administrative responsibilities of the Commissioner."  Claussen v.

Chater, 950 F.Supp. 1287, 1292 (D.N.J. 1996); (citing Stewart v. Sec'y of Health, Educ. &

Welfare, 714 F.2d 287, 290 (3d Cir. 1983)).  The standard affords "deference to inferences

drawn from the facts if they, in turn, are supported by substantial evidence."  Schaudeck v.

Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999).  "The inquiry is not whether the

reviewing court would have made the same determination but, rather, whether the

Commissioner's conclusion was reasonable."  Schonewolf v. Callahan, 972 F. Supp. 277, 284

(D.N.J. 1997); (citing, Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988)).  Therefore, a court

may not "set the Commissioner's decision aside if it is supported by substantial evidence, even if

[the reviewing court] would have decided the factual inquiry differently."  Hartranft v. Apfel,

181 F.3d 358, 360 (3d Cir. 1999).

The reviewing court has a duty to review the evidence in its totality.  Daring v. Heckler,

727 F.2d 64, 70 (3d Cir. 1984).  In order to do so, "a court must 'take into account whatever in

the record fairly detracts from its weight.'" <u>Schonewolf</u>, 972 F. Supp. at 284; (<u>quoting</u>

<u>Willibanks v. Sec'y of Health & Human Servs.</u>, 847 F.2d 301, 303 (6th Cir. 1988)) (internal

citation omitted).  The Commissioner has a corresponding duty to facilitate the court's review:

"[w]here the [Commissioner] is faced with conflicting evidence, he must adequately explain in

the record his reasons for rejecting or discrediting competent evidence."  <u>Ogden v. Bowen</u>, 677

F. Supp. 273, 278 (M.D. Pa. 1987); (<u>citing</u>, <u>Brewster v. Heckler</u>, 786 F.2d 581, 584-86 (3d Cir.

1986)).  As the Third Circuit has held, access to the Commissioner's reasoning is essential to a

meaningful court review:

> [U]nless the [Commissioner] has analyzed all evidence and has sufficiently
> explained the weight he has given to obviously probative exhibits, to say that his
> decision is supported by substantial evidence approaches an abdication of the
> court's "duty to scrutinize the record as a whole to determine whether the
> conclusions reached are rational."

<u>Gober v. Matthews</u>, 574 F.2d 772, 776 (3d Cir. 1978); (<u>quoting</u>, <u>Arnold v. Sec'y of Health</u>,

<u>Educ. & Welfare</u>, 567 F.2d 258, 259 (4th Cir. 1977) (internal citation omitted)).  Nevertheless,

the court is not "empowered to weigh the evidence or substitute its conclusions for those of the

fact-finder."  <u>Williams v. Sullivan</u>, 970 F.2d 1178, 1182 (3d Cir. 1992); (<u>citing</u>, <u>Early v. Heckler</u>,

743 F.2d 1002, 1007 (3d Cir. 1984)).

## D. Analysis

Plaintiff contends the ALJ erred as a matter of law by failing to discuss important

supportive evidence to his case, failing to give adequate weight to the opinion of his treating

neurologist, Dr. van der Sluis, and failing to properly analyze his subjective complaints.  (Pl.'s

Br. at 1).  For the reasons set forth below, the Court disagrees and affirms the ALJ's decision.

## 1. The ALJ Appropriately Discussed Important Supportive Evidence to Plaintiff's Case

Plaintiff argues that the ALJ ignored and mischaracterized evidence by (1) stating that Plaintiff tolerated therapy well; and (2) failing to accord proper weight to evidence of his alleged mental impairment. (Pl.'s Br. at 13-16). A review of the ALJ's decision and a close inspection of the record do not support such assertions. There is substantial evidence that supports the ALJ's findings.

The ALJ's statement that Plaintiff was noted to tolerate therapy well, standing alone, does not support an inference that the ALJ did not consider important supportive evidence to Plaintiff's case. Rather, the ALJ's finding that Plaintiff suffers from a "severe" impairment indicates that he did indeed take into account evidence favorable to Plaintiff. For example, the ALJ specifically acknowledged Plaintiff's "status post laminectomy and the side effects thereof." (R. at 19). The ALJ also noted "it is evident that the [Plaintiff] suffers from some limitation due to his impairments, and as a result, his capacity to perform work is affected." (R. at 21). The record indicates the ALJ considered evidence favorable to Plaintiff, but ultimately concluded that Plaintiff was not disabled for purposes of the Act. This conclusion was based on the finding that Plaintiff had the residual functional capacity, under step five of the disability analysis, to perform a full range of sedentary work. (R. at 21-22). Since there is substantial evidence to support this finding,[2] the ALJ's decision must be upheld.

Plaintiff also claims that by failing to mention psychiatric records, the ALJ did not

---

[2] The ALJ's determination that Plaintiff retains the residual functional capacity to perform sedentary work is based on objective medical evidence. A state agency physician's Residual Functional Capacity Assessment found that Plaintiff could lift up to ten pounds, stand and/or walk at least two hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (R. at 21.) A state agency psychiatric review found that Plaintiff showed no signs of clinical depression, showed no evidence of cognitive deficits, and was not functionally limited by psychological symptoms by themselves. Id.

properly consider evidence of his alleged mental impairment.  (Pl.'s Br. at 13-16).  Specifically,

Plaintiff contends that because the ALJ did not mention the name of Plaintiff's psychiatrist in his

decision, the ALJ did not properly weigh the psychiatrist's opinion.  (Pl.'s Br. at 13-14).

Plaintiff's argument is without merit.  The ALJ's decision properly considered psychiatric

evidence in concluding that Plaintiff's alleged mental impairment was non-severe.  Substantial

evidence supports this decision.

The ALJ specifically noted that "the evidence regarding the [Plaintiff's] mental

impairment establishes that he has suffered from a slight affective disorder."  (R. at 20).  The

ALJ also stated that "the evidence establishes that the [Plaintiff] experiences . . . slight

limitations in restrictions of activities of daily living; slight limitations in difficulties in

maintaining social functioning; slight deficiencies of concentration, persistence or pace for

performing simple tasks; and no episodes of decompensation when performing simple tasks."

(R. at 20-21).  Furthermore, the ALJ pointed out that Plaintiff receives no treatment for his

alleged depression and fails to demonstrate how his mental condition affects his functionality.

(R. at 21).  Contrary to Plaintiff's assertions, based on these specific evidentiary references, it

cannot be said that the ALJ did not properly consider all the evidence regarding his alleged

mental impairment.

Additionally, an examination of Plaintiff's medical records for Dr. Mysels reveals that

there is support for the ALJ's decision in these records.  Although Dr. Mysels diagnosed Plaintiff

with mood disorder due to chronic pain, he did not feel that Plaintiff demonstrated signs of

clinical depression.  (R. at 461).  Dr. Mysels also stated that Plaintiff "presents as cooperative,

pleasant;" that "[h]e is alert, oriented [times three] with spontaneous, coherent, relevant speech;"

14

that "there is no psychomotor slowing or suicidal ideation;" that "[h]e . . . does not express bizarre or paranoid ideas;" that there is "[n]o evidence of cognitive deficits;" and that his "[i]nsight and judgment are good." (R. at 471). These findings support the ALJ's finding that Plaintiff did not have a severe mental impairment and are consistent with the other evidence regarding his mental condition. Thus, the ALJ did consider all the evidence with respect to Plaintiff's alleged mental impairment. Furthermore, in finding that Plaintiff suffered from a "slight affective disorder" within the meaning of listing 12.04A1 of Appendix 1 of the regulations (R. at 20),[3] the ALJ considered and gave appropriate weight to medical evidence that was more favorable to Plaintiff's cause such as the diagnosis of mood disorder secondary to chronic pain and the GAF scores (R. at 453, 652).[4] Since it is evident that the ALJ considered all the relevant evidence, and because his determination that Plaintiff did not suffer a severe mental impairment is supported by substantial evidence, this Court will not disturb the decision of the ALJ.

---

[3]Under this listing, an individual suffers from a slight affective disorder if he establishes medically documented persistence of a depressive syndrome characterized by at least four of the following: anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, or hallucinations, delusions, or paranoid thinking. 20 C.F.R. § 404, app. 1, subpart P, listing 12.04A1.

[4]Plaintiff's GAF scores ranged from 50 to 55. (R. at 453, 652.) A GAF score between 41 and 50 indicates serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, (2002). A GAF score between 51 and 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id.

**2. The ALJ Properly Considered the Opinion of Plaintiff's Treating Neurologist**

Plaintiff next argues that the ALJ failed to accord the appropriate amount of weight to the medical opinion of Dr. van der Sluis, his treating neurologist.  (Pl.'s Br. at 16-19).  Plaintiff claims that Dr. van der Sluis's opinion was entitled to controlling weight, or, at a minimum, to deferential weight (Pl.'s Br. at 17-18).  Under the regulations, opinions of treating physicians are generally given more weight.  20 C.F.R. § 404.1527(d)(2).  A treating source's opinion on the nature and severity of an individual's impairment is entitled to controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  Id.  When the treating source's opinion is not given controlling weight, the regulations list several factors to consider in determining the weight accorded to the opinion: length of the treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and whether the opinion is that of a specialist.  20 C.F.R. § 404.1527(d)(2) - (d)(5).  When medical evidence is conflicting, the ALJ must decide between the conflicting evidence.  Williams, 970 F.2d at 1187 (citing Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)).  Here, since there is substantial evidence in the record that contradicts Dr. van der Sluis' opinion, that opinion is not entitled to controlling weight.  Furthermore, the ALJ properly considered the evidence in deciding to give no significant weight to Dr. van der Sluis' opinion.

In his decision, the ALJ "[found] that Dr. van der Sluis' assessment of disability and the [Plaintiff's] inability to work is unsupported by his own objective findings and of the record as a whole."  (R. at 20).  The ALJ explained that "Dr. van der Sluis consistently reports the

16

[Plaintiff's] prognosis as good and there are no objective findings which would support his extremely restrictive assessments." (Id.)  In a November 2002 medical record, Dr. van der Sluis reported that Plaintiff could not work and had functional capacity to perform only little or none of the duties of usual occupation or self care.  (R. at 429-30).  In a July 2003 medical record, Dr. van der Sluis reported that Plaintiff could sit, stand, and walk for a maximum of one hour during an eight-hour workday and that he was incapable of tolerating even low work stress.  (R. at 556).  In this same record, Dr. van der Sluis states that Plaintiff's prognosis is good and that he can perform a full-time competitive job that requires keeping the neck in a constant position (R. at 554-59).  Other records are also inconsistent with Dr. van der Sluis' opinion that Plaintiff was incapable of working.  In September 2002, Dr. van der Sluis reported that a repeat lumbar spine MRI showed that Plaintiff had post-laminectomy changes, mild scarring, but no new disc herniation.  (R. at 457).  Dr. van der Sluis also stated that Plaintiff was a "well looking veteran in no acute distress."  (R. at 455).  In November 2002, Dr. van der Sluis reported similar findings, but added that Plaintiff had normal strength and right-side sensory loss, which was fairly reproducible but not 100 percent consistent.  (Id.)  In February 2003, Dr. van der Sluis reported essentially the same findings.  (R. at 615).  Based on these records, it was reasonable for the ALJ to conclude that Dr. van der Sluis' opinion that Plaintiff could not work was unsupported by the doctor's own objective findings.

Moreover, there is substantial evidence in the record as a whole that is inconsistent with Dr. van der Sluis' opinion.  An October 2001 functional capacity exam, which revealed significant self-limitation by Plaintiff, indicated that he could perform, at a minimum, sedentary work.  (R. at 372).  Also in October 2001, Dr. Lombardi reported no sensory loss, no reflex loss,

no muscle weakness, and some range of motion limitations.  (R. at 174).  In November 2001, Dr. Sicherman examined Plaintiff and reported that he could work, provided that he did not lift more than twenty-five or thirty pounds and be allowed to sit for a few minutes several times a day.  (R. at 341).  Dr. Miranda, a non-treating state agency physician, determined that Plaintiff could frequently lift up to ten pounds, stand and/or walk at least two hours in an eight-hour workday, and sit about six hours in an eight-hour workday.  (R. at 206).  Another assessment by a state agency physician in June 2002 reported the same conclusions.  (R. at 394).  In that same month, Dr. Sawicki examined Plaintiff and reported decreased range of motion, no loss in muscle strength, no sensory changes, and the ability to walk without a cane.  (R. at 387-88).  In November 2003, Dr. Moosvi and Dr. Nygaard reported adequate motor strength, no sensory loss, and normal gait.  (R. at 650).  The evidence in its totality establishes that Dr. van der Sluis' opinion regarding Plaintiff's inability to work has only moderate support at best and is inconsistent with the record as a whole.  Taking these factors into account, the ALJ appropriately made a choice between conflicting evidence and chose the side with the greater weight of evidentiary support.  Due to the considerable amount of medical evidence, from both treating and non-treating physicians, contradicting Dr. van der Sluis' opinion, the ALJ was easily within his discretionary boundaries to place no significant weight upon that opinion in reaching his own determination that Plaintiff was not disabled.

### 3. The ALJ Properly Considered Plaintiff's Subjective Complaints

Plaintiff alleges that the ALJ failed to properly analyze and consider his subjective complaints.  (Pl.'s Br. at 19-21).  "An ALJ must give serious consideration to a [Plaintiff's] subjective complaints of pain . . . ."  Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993);

18

(citing, Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985)).  However, "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence."  Hartranft, 181 F.3d at 362.  "[S]ubjective complaints must be substantiated by medical evidence."  Williams, 970 F.2d at 1186.  "An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability [under the Act]."  42 U.S.C. § 423(d)(5)(A).   The Plaintiff bears the burden to "show that he has a condition which reasonably could be expected to produce the alleged symptoms that are the cause of his inability to work."  Williams, 970 F.2d at 1186; (citing, Green v. Schweiker, 749 F.2d 1066, 1069-70 (3d Cir. 1984)).  Ultimately, the ALJ has discretion "to evaluate the credibility of a Plaintiff's testimony and to render an independent judgment in light of the medical findings and related evidence regarding the true extent of such disability."  Alexander v. Shalala, 927 F. Supp. 785, 795 (D.N.J. 1995) aff'd, 85 F.3d 611 (3d Cir. 1996); (citing LaCorte v. Bowen, 678 F. Supp. 80, 83 (D.N.J. 1988)).  Here, the ALJ carefully considered Plaintiff's subjective complaints of pain, but decided not to accord them significant weight because they were inconsistent with the objective medical evidence.

At the hearing, Plaintiff made a number of assertions regarding his physical and mental condition.  He stated that he was depressed since his injury.  (R. at 29).  He stated that his back was getting worse since surgery and that the pain was in his lower back but radiated all the way down his left leg.  (R. at 32-33).  He stated that the pain was constant and was made worse by moving around.  (R. at 33).  He stated that he could not lie on his left side, but laying on his right side provided relief.  (R. at 35).  He stated that he remained in that position for fourteen to sixteen hours on a typical day.  (Id.)  He stated that he could stand for about fifteen minutes before the pain caused him to alternate between sitting and standing.  (R. at 36-37).  He stated

19

that he first sought psychiatric treatment because he was feeling down and was irritable around

people.  (R. at 39).  He stated that he shaved only twice a week because leaning over the sink

bothered his back.  (R. at 40).  He stated that he had not had a haircut in six months.  (Id.)  He

stated that he had a difficult time getting dressed and cooked only when using a microwave.  (R.

at 41-42).  He stated that both Dr. Lombardi and Dr. Sicherman hardly examined him and that

neither wanted to touch him.  (R. at 44).  He stated that Dr. van der Sluis, in comparison to the

other two doctors, did not think he was exaggerating his complaints.  (R. at 45).

      The ALJ's decision notes that Plaintiff's "subjective complaints of disabling pain and

weakness, and other symptoms and limitations precluding all significant work activity are not

credible."  (R. at 19.)  In making this finding, the ALJ considered the following factors:

> (1) the nature, location onset, duration, frequency, radiation, and
> intensity of any pain; (2) precipitating and aggravating factors (e.g.,
> movement, activity, environmental conditions); (3) type, dosage,
> effectiveness, and adverse side-effects of any pain medication; (4)
> treatment, other than medication, for relief of pain; (5) functional
> restrictions; and (6) the claimant's daily activities and work record.

Id.  The ALJ's opinion was that the "objective findings . . . could not reasonably produce the

extent of the alleged subjective complaints."  (Id.)  To provide support for his opinion, the ALJ

specifically pointed to the medical evidence.  After undergoing surgery in June 2001, Plaintiff

was noted to tolerate the procedure well.  (Id.); (see R. at 330).  In October, Dr. Sicherman, a

treating physician, stated that Plaintiff could return to work, provided that he did not lift more

than thirty pounds and that he be allowed to sit for a few minutes several times a day.  (R. at 19-

20; see, R. at 341).  Plaintiff was thought to be able to handle, at a minimum, sedentary work

after significant self-limitation was observed during a functional capacity evaluation.  (R. at 20;

see, R. at 372).  In June 2002, Dr. Sawicki reported that Plaintiff had a normal gait, had the

ability to walk without a cane, had some decreased range of motion with his back, had full muscle strength, and had no sensory loss.  (R. at 20; see R. at 388-89).  September 2002 treatment notes from the VA hospital stated that Plaintiff had degenerative disc disease at the L5-S1 level, but that there was no evidence of significant spinal stenosis or focal disc herniation.  (R. at 20; see, R. at 458).  The VA records also indicated that Plaintiff experienced relief with his TENS unit.  (R. at 20; see, R. at 449).  With respect to Plaintiff's allegations of a mental impairment, he received no treatment for depression and failed to establish that his mental condition affects his functionality.  (R. at 21; see, R. at 425).

Based on objective medical evidence, there is substantial evidence supporting the ALJ's decision not to treat Plaintiff's testimony as credible evidence of his alleged disability.  By carefully considering the factors listed above, the ALJ gave serious thought to Plaintiff's subjective complaints.  However, the ALJ exercised his rightful discretion to weigh the evidence and determine that Plaintiff's complaints were not credible in light of the objective medical evidence and even Plaintiff's own testimony.  For example, multiple medical records, including at least one completed by a treating physician, suggested that Plaintiff could return to work.  The medical records finding that Plaintiff had no loss in muscle strength are inconsistent with Plaintiff's claim that he spends up to sixteen hours a day lying down.  Furthermore, Plaintiff was observed to exhibit significant self-limitation and inappropriate illness behavior.  At hearing, Plaintiff testified that he lived on a second floor walk-up and that he could and did drive a car.  Such assertions could reasonably be construed as inconsistent with a claim for disability.  Plaintiff has failed to establish that he has a condition which reasonably could be expected to produce the alleged symptoms that are the cause of his inability to work, and because there is

substantial evidence for the ALJ's decision not to credit Plaintiff's subjective complaints, this

Court finds that the ALJ properly analyzed and considered those complaints.

### III. Conclusion

For the reasons stated above, this Court **affirms** the Commissioner's determination that

the Plaintiff was not disabled.  Accordingly, this case is **CLOSED**.


Date:   March 13, 2006
Orig:   Clerk's Office
cc:     All parties
        File

                                    /s/Dennis M. Cavanaugh
                                   DENNIS M. CAVANAUGH, U.S.D.J.